UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| COREY ANTHONY COLLINS,<br><br>          Petitioner,<br><br>v.<br><br>DOMINGO URIBE, JR., Warden,<br><br>          Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil No. 12cv1301 DMS (WMc)<br><br>**REPORT AND<br>RECOMMENDATION OF<br>UNITED STATES MAGISTRATE<br>JUDGE RE: DENIAL OF<br>PETITION FOR WRIT OF<br>HABEAS CORPUS**<br><br>**[ECF No. 1.]** |

This Report and Recommendation is submitted to United States District Judge Dana M. Sabraw pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

On May 29, 2012, Corey Collins (hereinafter "Petitioner" or "Collins"), a state prisoner proceeding *in pro per* filed a Petition for a Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner was convicted by a Kern County Superior Court jury on August 10, 2009, of one count of second degree

robbery and participation in a street gang  (Pet., ECF No. 1 at 1-2;[1] Lodgment No. 2 at 285.)  Petitioner was sentenced to a term of 27 years in prison which was vacated pursuant to an appeal from the judgment and reduced to a term of 17 years in prison on remand.  (Lodgment No. 6 at 2.)

In his federal Petition, Collins alleges his rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated because: (1) the prosecutor impermissibly argued Petitioner's guilt was proven by virtue of his association with fellow gang member and robber, Ernest Cartwright; (2) the court improperly permitted the introduction of evidence concerning witness intimidation in an unrelated case; and (3) the court improperly admitted false and insufficient evidence to prove Collins was the second perpetrator of the robbery.

Respondent has filed an Answer to the Petition, along with a supporting Memoran- dum of Points and Authorities ("Ans. Mem."), and has lodged portions of the state court record.  (ECF Nos. 20, 21.)  Respondent contends habeas relief is unavailable because the state court's adjudication of claims one and two in the Petition was neither contrary to, nor an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts.  Respondent also contends federal habeas relief is unavailable to Petitioner as to claim three because is procedurally defaulted.  (Ans. Mem. ECF No. 20 at 5-6.)  The deadline for Petitioner to file a Traverse was August 9, 2013.  (ECF No. 19.)  No Traverse was filed.

## II.

## STATE PROCEEDINGS

On August 10, 2009, a jury found Petitioner guilty of second degree robbery (Pen Code § 212.5, subd. c, count 1) and active participation in a criminal street gang Pen. Code § 186.22, subd. a ( §186.22(a); count 4.  The jury also found true the allegations that defendant committed the robbery for the benefit of or in association with a criminal

---

[1] When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, the Court will refer to the pages assigned by that system.

12cv1301 DMS (WMc)

street gang (§ 186.22, subd. b (§ 186.22(b)), he had suffered a prior conviction within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), he had suffered a prior serious felony (§ 667, subd. (a)), and he had served three prior prison terms (§ 667.5, subd. (b)).  [Lodgment No. 6 at 2.]  The Court sentenced Collins to 27 years in prison, as follows: the upper term of five years for the robbery, doubled pursuant to the Three Strikes law, plus a 10-year term for the gang enhancement, plus a five-year enhancement for the prior serious felony enhancement, and two one-year terms for the prior prison term enhancements.  On the active participation offense, the court imposed the six-year upper term, stayed pursuant to section 654.  *People v. Collins*, 2011 WL 242363, *1-5 (Cal. App. 5 Dist Jan, 27, 2011.)  [Lodgment No. 6 at 2-3.]

Collins appealed from the judgment and raised the following issues: "(1) the prosecutor committed misconduct by arguing guilt by association, (2) the trial court erred by admitting evidence of retaliation against a witness in an unrelated case, (3) the evidence was insufficient to support the gang enhancement and the active participation conviction, (4) the evidence was insufficient to support the true finding on one of the prior prison term enhancements, and (5) the sentencing court denied defendant the right to allocute and an opportunity to speak."  *People v. Collins*, No. F058932, 2011 WL 242363 *1 (Cal. App. 5 Dist. January 27, 2011).  [Lodgment No. 6.]

On January 27, 2011, the appellate court issued an opinion reversing the gang enhancement, vacating the 27-year sentence and remanding the case to superior court for re-sentencing.  [Lodgment No. 6 at 2.] In all other respects, the state appellate court affirmed the state court conviction .  *People v. Collins*, No. F058932, 2011 WL 242363 *1 (Cal. App. 5 Dist. January 27, 2011). [Lodgment No. 6.]  Collins sought further review of the appellate court's ruling by the California Supreme Court.  The California Supreme Court summarily denied review on April 13, 2011. [Lodgment No. 10.]

At the same time Collins sought discretionary review in the California Supreme Court, the remand proceeded in the superior court which, without the 10-year term for

1  gang enhancement, re-sentenced Collins to 17 years in prison on July 14, 2011. [Lodg-
2  ment No. 12 at 3.]

3      After the new sentence was imposed, Petitioner was permitted to pursue a second
4  appeal in which he contended the trial erred by failing to stay a concurrent six-year term
5  it imposed on his participation in a criminal street gang conviction.  On July 31, 2012, the
6  Court of appeal issued its decision staying the six-year term. [Lodgment No. 16 at 4.]
7  Because the sentence for the gang participation conviction had been imposed to run
8  concurrently with the sentence for Collins' robbery conviction, there was no effect on the
9  length of the 17-year term imposed at re-sentencing. [Lodgment No. 16 at 3-4.]

10      On June 2, 2011, Collins filed a petition for writ of habeas corpus in the Kern
11  County superior court.  [Lodgment No. 17 at 1.]  The petition was denied in a reasoned
12  opinion on June 29, 2011.  [Lodgment No. 17 at 3.]  On November 2, 2011, Collins filed
13  a petition for writ of habeas corpus in the state appellate court. [Lodgment No. 18.] The
14  court of appeal summarily denied the petition on December 11, 2011.  [Lodgment No.
15  19.] On November 5, 2012, Collins filed his last state habeas corpus petition in the
16  California Supreme Court.  [Lodgment No. 20.] In the petition, Collins contends his Fifth
17  and Fourteenth Amendment rights were violated because his conviction was achieved
18  using insufficient and false evidence as well as the prosecutor's improper argument based
19  on "guilt by association". [Lodgment No. 20.]  On January 23, 2013, the California
20  Supreme Court denied the petition with citations to *In re Waltreus*, 62 Cal. 2d 218, 225
21  (1965) (claims raised and rejected on appeal may not be raised again on habeas corpus);
22  *Ex parte Dixon*, 41 Cal. 2d 756, 759 (1953) ("writ will not lie where the claimed errors
23  could have been, but were not, raised upon a timely appeal"); and *In re Lindley*, 29 Cal.
24  2d 709, 723 (1947) (habeas corpus ordinarily is not competent to retry issues of fact or
25  the merits of a defense; the sufficiency of the evidence to warrant the conviction of the
26  petitioner is not a proper issue for consideration).  [Lodgment No. 21.]
27  ///
28  ///

4

# III.

# FACTUAL BACKGROUND

Petitioner is challenging the sufficiency of the evidence supporting his conviction in claim three of his Petition. [Petition, ECF No. 1 at 8, 28.]  Accordingly, the Court independently reviewed the state court record.  *See Jones v. Wood*, 114 F.3d 1002, 1008 (9th Cir. 1997).   Based on this review, the Court adopts, as a fair and accurate summary of the evidence presented at trial, the following statement of facts taken from the unpublished Court of Appeal opinion in *People v. Collins*, No. F058932, 2011 WL 242363 *1 (Cal. App. 5 Dist. January 27, 2011).  (Lodgment No. 6.)[2]

"On August 20, 2008, the victim was working at a clothing store that contained several visible surveillance cameras.  The store's back room contained a safe.  According to the victim, she arrived at the store at about 9:30 or 9:45 a.m., entered the store and counted the money in the two cash registers, which on this occasion contained about $280 and $300.  Then she opened the store's doors and started dressing a mannequin.  Meanwhile, two African-American men entered the store.  The victim did not see them enter, but she noticed them in her peripheral vision as they walked through the store.  One was "[w]ay over" six feet tall, humongous ... like a giant....  The other man was a lot shorter, about five feet six inches or five feet eight inches.

FN3.  The victim testified she was five feet three inches tall.

The victim recognized the shorter man.  He was always in the area of the store.  She had seen him in the parking lot and he had been a customer at the clothing store, but she had never spoken with him.

The taller man approached the victim and stood right behind her.  He said, 'It's a stickup, go to the back.'  He pushed her arm to make her go.  At this point, the victim became afraid because she was alone with the two men, she did not know whether the men had weapons, and the taller man was "just real big."  The taller man led her to the back.  The victim was not able to see his face because his shirt was covering it and she tried not to make eye contact.  She did notice that he was wearing a 'wave cap' on his head.  The cap was 'poofy,' so she could tell he had a lot of hair.

At this point in the victim's testimony, the prosecutor played the video from the store's cameras.  The first portion of the surveillance video showed the two men, their faces uncovered walking into the store.  The taller man was wearing a loose, white t-shirt, black shorts, and a white cap.  He appeared to have facial hair on his upper lip and chin.  The shorter man was wearing a black t-shirt and jeans, and he was carrying a white garment or cloth.  Another camera that recorded the

---

[2]  "Factual determination by state courts are presumed correct absent clear and convincing evidence to the contrary...."  *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Sumner v. Mata*, 449 U.S. 539, 545-47 (1981)(explaining the Court gives deference to state court findings of fact and presumes them to be correct.)

store's back room showed the door from the store opening and the victim and both men entering the back room. The taller man was holding the neck of his T-shirt over his nose with one hand and the shorter man was wearing a white garment or cloth over the lower part of his face and tied behind his head.

The victim testified that the taller man asked her, '[W]here's the key to the safe?' He said he knew she had the key and he asked her where the 'bigger guy' was. She still could not see the taller man's face. The victim answered that she did not have the key and her supervisor was not there. The taller man then removed the chain from her around her neck (which held only her timecard) because he believed it would open the safe. He tried to pull it over her head with one hand, but could not. When he used both hands to remove the neck chain, his T-shirt fell briefly off his face. He grabbed it and held it over his nose again. FN4. He walked with the neck chain toward the safe while the shorter man stood next to the victim. When the taller man returned, they conversed. As the victim moved toward the door leading into the store, the shorter man stopped her. The victim testified that she sat down at a table while the two men argued about who should go get the victim's purse, which they believed contained the key to the safe, even though the victim told them her keys would not open the safe. The shorter man walked to the front of the store to get the purse and threw it on the floor in front of the victim. When he got her keys, he walked toward the safe. The victim and the taller man followed. The shorter man tried to open the safe with the keys. Then the taller man and the victim came to the safe and the shorter man acted as the lookout at the door into the store. The taller man tried to figure out how to open the safe. He continued telling the victim she had a key to the safe. She told him she did not and she showed him that she could not open it. She was still afraid. FN5.

FN4. The victim appeared to be looking at him when this occurred.

FN5. On cross-examination, the victim testified that she had never opened the safe. She dropped money into the top portion of it and the money fell into the bottom. No one who worked in the store had access to the safe.

The shorter man picked up several belts, which the victim assumed were to tie her up. Having decided they could not open the safe, the three of them walked back toward the door to the store. The taller man and the victim left the back room and entered the store; the shorter man returned the handful of belts to a box of accessories. He then stood in the doorway, looking into the store. The prosecutor asked the victim about the shorter man's jeans. She said they looked like the jeans with patches that were sold in the store.

The victim testified that the taller man told her to take the money (about $280) out of the register. She complied because she was forced not because she was willing. The video showed her removing the money from the first register while the taller man watched from the other side of the counter. She laid the money on the counter and the taller man picked it up. She then removed the money (about $300) from the second register as the taller man looked on. She set it down and he picked it up. He asked her if that was all of it and she said it was. He put the money in his pocket as he turned and walked away. At this point, the shorter man approached the victim and asked her where the tape was. She told him there was no tape. He said, '[S]o it's just recording?' and she said '[Y]eah.'

After both men walked out, the victim left the store and went into the adjacent drugstore to inform the employees she had been robbed. Then she called her manager and told him to call the police.

Later that day, Detective Miller showed the victim six-pack photographic lineups. The detective admonished her by reading the paragraph typed on the bottom of the lineup. On the first lineup, the victim circled the photograph of Cartwright, the shorter man, and signed the lineup. On the second lineup, the victim pointed to two men and said it was either one or the other. The two men shared certain characteristics with the taller man. She did not circle any photograph or sign the lineup because she was not sure. When she looked at the third lineup, she identified defendant as the taller man, circled his photograph and signed the lineup. She chose defendant because of his hair and the upper part of his face. At trial, however, the victim did not recognize the defendant as the taller man. She said she had never seen defendant before. But she agreed that when she spoke to the police on the day of the robbery, the incident was still fresh in her mind and she was telling the truth. What she told the police about the incident and the men who robbed her was a true reflection of what had happened to her.

The victim testified that she did not want to be in court testifying. She explained that it was very stressful because after the incident, she had to continue working in the store. She had never been in this type of situation before.

Detective Miller (the detective) testified that he responded to the scene immediately. After receiving information about the suspects, the detective produced two photographic lineups, one of which contained Ernest Cartwright. The lineups contained suspects who looked similar to the perpetrator. When the detective showed the lineups to the victim, he admonished her, pursuant to the paragraph at the bottom of the lineup, that the lineup may or may not contain a picture of the perpetrator, that hairstyles and facial hair can be easily changed, and so on. When the victim looked at the first lineup, she identified Cartwright as one of the perpetrators, and she circled his photograph and signed the paper. When she looked at the second lineup, she said she did not see the other perpetrator in the lineup. She said the chin hair was the same on some of the subjects, but they were lighter complected. She mentioned that the perpetrator had braided hair. She did not circle any photograph on the lineup. After learning more about the perpetrator, the detective created a third lineup that contained a photograph of defendant. When the detective showed this lineup to the victim, she immediately pointed to defendant's photograph and said, '[T]hat's him.' She said he had the eyebrows, the height, and the dark complexion. She circled the photograph and signed the lineup.

At trial, the prosecutor requested that the jury be allowed to view defendant's physical characteristics. Defendant stood for the jury, then turned to provide a side view.

Officer Lewis (the officer), a member of the Bakersfield police gang unit, testified as a gang expert about the Westside Crips gang, which contained more than 50 members and whose color was turquoise. He stated that the store was located within the gang's territory. The gang's primary activities were homicide, robbery, carjacking, assault with a deadly weapon, witness intimidation, selling narcotics, and burglary. Gang members who committed these activities, or 'put[ ] in work,' were elevated in the gang and given more respect.

The officer described two cases. On October 22, 2006, Larry Bailey, a parolee, was found with a loaded .22-caliber rifle and a large amount of cocaine base. He stated he was a Westside Crips member, and he pled to charges of being in possession of a firearm and also to a gang enhancement.

7

On December 4, 2006, Clarence Wandick, also a Westside Crips gang member, was found with a large amount of cocaine base during a search pursuant to warrant. He pled to charges of drug possession and a felony committed on behalf of a gang.

Based on the officer's experience with the Westside Crips and the cases of Bailey and Wandick, the officer believed the gang was engaged in an ongoing pattern of criminal activity.

According to the officer, Ernest Cartwright, the man chosen by the victim from the first photographic lineup, was an active member of the Westside Crips gang. He was known by the moniker of 'Easy' or 'Ease.' The officer identified the man chosen by the victim from the third photographic lineup as defendant. According to the officer, defendant was also an active participant in the Westside Crips gang. He was known by the moniker 'Tall C.' The officer defined an active participant as a 'subject who admits membership, as well as carries out crimes for the benefit, association, and furtherance of the criminal street gang. Somebody who associates with other gang members.'

The officer reviewed the current case and noted that the robbery occurred within the traditional territory of the Westside Crips. The officer explained that gang members often commit crimes within their own territory to avoid starting gang wars, they often commit robberies, and in the majority of gang crimes, they commit crimes with another gang member. Considering a hypothetical reflecting the facts of this case, the officer opined that it was very significant that two gang members together would commit a robbery at a store withing their own gang's territory. He opined that this hypothetical offense would be committed on behalf of, at the direction of, or for the benefit of the gang. Hypothetically, such a crime would promote, further, or assist the gang members in criminal conduct. The money taken in the robbery would give the perpetrators access to firearms or narcotics. The robbery itself would instill fear into the citizens, business owners and employees within the gang's territory. It would inform community and rival gang members that the gang was claiming its territory. The officer also opined that gang members will not carry out felonious offenses such as robberies, which carry severe consequences, unless they are directed to do so or they desperately need the money to survive.

The officer testified that it is very common for victims of gang-related crimes to be reticent to testify. In his opinion, nine times out of ten, the witnesses do not want to come forward. They are in fear for their lives and thei family members' lives. The officer had seen examples of witnesses being harmed. For example, in the Brandy Nigh case, after the witness testified, gang members took her to a canyon and shot her in the head. She survived and the suspects were convicted.

*People v. Collins*, No. F058932, 2011 WL 242363 *1 (Cal. App. 5 Dist. January 27, 2011). [Lodgment No. 6.]

///
///
///
///

# IV.

## PETITIONER'S CLAIMS

8

The Petition presents the following claims:

1. The prosecutor committed misconduct by improperly arguing "guilt by association" to prove Collins committed the robbery. Specifically, the prosecutor contended because Collins and the other defendant, Cartwright, belonged to the same gang, Collins must have been the person who committed the robbery with Cartwright;

2. The trial court improperly allowed the introduction of witness retaliation testimony concerning a victim in an unrelated case who was shot by gang members after testifying at trial against the associates of those gang members; and

3. The Court allowed the introduction of insufficient and false evidence [i.e. expert opinion that the robbery was done for the benefit of and at the direction of the Westside Crips gang] to prove Petitioner was one of the two persons who committed the robbery. [*See* Petition, ECF No. 1 at pp. 6-21.]

## V.

## DISCUSSION

For the following reasons, the Court finds that Petitioner is not entitled to habeas relief. The Court therefore **RECOMMENDS** the Petition be **DENIED**.

## A.   Standard of Review

This action was initiated after enactment of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Under 28 U.S.C. § 2254(d), as amended by AEDPA:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. A decision may also involve an unreasonable application "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.*

"[A] federal habeas court may not issue the writ simply because the court con-cludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . ." *Williams*, 529 U.S. at 412. In order to satisfy section 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S.Ct. 770, 786-87 (2011). The Supreme Court has stated that "[i]f this standard is

1    difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue

2    the writ in cases where there is no possibility fairminded jurists could disagree that the

3    state court decision conflicts with this Court's precedents."  *Id.* at 786 ("Section 2254(d)

4    reflects the view that habeas corpus is a guard against extreme malfunctions in the state

5    criminal justice systems, not a substitute for ordinary error correction through appeal.")

6    (internal quotation marks omitted).

7    **B.    Claim One:  PROSECUTORIAL MISCONDUCT IN VIOLATION OF DUE**

8    **PROCESS RIGHTS**

9         Collins contends he was denied his due process rights when the prosecutor

10    attempted to establish his guilt based on his gang association with the other man first

11    identified by the victim as a perpetrator of the robbery, Ernest Cartwright.  Respondent

12    argues the prosecutor's argument was proper, therefore the state court's determination

13    was reasonable.

14    **1.    The Trial Record - Closing Argument**

15    The prosecutor made the following remarks in his closing argument:

16    "I want to start off by talking about the robbery.  There were five elements that I
      have to prove beyond a reasonable doubt before you can convict the defendant.

17    The defendant took property that was not his own; the property was taken from
      another person's possession and immediate presence; the property was taken

18    against that person's will, Labrena James; the defendant used force or fear to take
      the property or to prevent the person from resisting; and when the defendant used

19    force or fear to take the property, he intended to deprive the owner of it perma-
      nently.  Let's take a look at this video because I think the video tells it all.  Okay.  I

20    want to start with showing you camera ten, and I'm going to open that file.  And
      I'm going to play it.  It's pretty quick, so I'm going to play it through a couple of

21    times.  There's one time.  And we know this is the front entrance to the store.  I'm
      going to play it again.  An here's Mr. Collins walking in through the front.  Take a

22    look – when I started playing, take a look at his height, take a look at his shoulder
      width, his physical characteristics, his weight, the way his shoulders appear to be

23    squared off, his skin color, his complexion, as well as the wave cap that's on his
      head.  Take a look at him and also tale a look at Mr. Cartwright who comes in

24    next.... Here's Mr. Collins, and then Mr. Cartwright, who are walking in the store.
      Okay?  You can see those two suspects are obviously different height and different

25    size.  These pieces of evidence that were admitted, here's Mr. Collins who was
      booked into the Kern County Sheriff's Department in September of last year,

26    almost immediately after this incident occurred....Okay.  Here it is.  This freeze
      frame, I think, says it all.  Take a look at – at the shoulders.  We already saw the

27    height, the way his body looks.  We had Mr. Collins stand up in court for us.
      That's him.  That's the defendant with the goatee.  He's got the wave cap.  That's

28    consistent with the booking photograph, with his hair, the hair in the booking
      photograph.  Remember Labrena James says that's one of the reasons why she

circled that picture.  And she told Officer Miller, that's him.  She pointed to the picture, that's him, when Officer Miller showed her that six-pack ID.  The wave cap is consistent there.  You can take a look at Mr. Collins who's sitting in court right now, and that's a straight-on head shot of Mr. Collins and Mr. Cartwright.  But if we're not convinced by the video alone, if the – this video alone doesn't convince you, there's two other major pieces of evidence that corroborate this.  And that is Labrena James' testimony.  In court she was asked to ID the defendant.  And she said, no, I've never seen this gentleman, right?  But we're less concerned about what Labrena has to say about ID today because this is a year since it's gone by.  We're more concerned about what Labrena James said a couple of hours the same day after the robbery happened....If you saw me having dinner a year from now, you may or may not recognize me.  Okay?  That's why what Labrena James told Officer Miller is more important than what she said here in court saying she's never seen this gentleman before.  Because what she told Officer Miller was, that's him.  She pointed to the six-pack ID.  That's him.  She was read this admission.  You can read it in the back.  She talks about picking someone out, picking out a suspect.  It goes through some issues as to not identifying the wrong person, and then she signed and dated it....What we know is she was able to immediately point to Mr. Collins in the number two position and ID him on that date, and that's what's important.  Now if that doesn't convince us, if Labrena James picking him out on the day it happened and this video right here doesn't convince us that Cory Collins is the guy who did this robbery, then what about this: What about the fact that Cory Collins is in the same gang with Ernest Cartwright, right?  What are the chances that there's another six foot six gentleman who looks identical to Cory Collins, is in the same Westside Crip gang as Ernest Cartwright, because I think the picture is clear that that's Ernest Cartwright, and we heard from Officer Lewis that Ernest Cartwright is a Westside Crip gang member.... So we know Cory Collins is a gang member or at least was last year when this incident happened.  We know Ernest Cartwright was a Westside Crip gang member, at least when this incident occured, and that's – that's a third key to this, in how we know this is Cory Collins.  Because who else is going to do this robbery with Ernest Cartwright but one of his gang member friends."

*See* Lodgment No. 2 at 249- 256, Reporter's Transcript of Proceedings.

### 2.     The State Court's Decision

Collins raised this prosecutorial misconduct claim in the petition for review he filed in the California Supreme Court.  (Lodgment No. 9.)  The California Supreme Court denied the petition without citation of authority.  (Lodgment No. 10.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. *Ylst v. Nunnemaker*, 501 U.S. at 805-06.  In its opinion dated January 27, 2011, the California Court of Appeal rejected Collins' contention that the prosecutor committed misconduct by arguing guilt by association and instead found the prosecutor made a proper argument by discussing gang membership as one of several pieces of evidence which established identification of Collins as a perpetrator of the robbery:

12cv1301 DMS (WMc)

"This [gang membership] argument does not convince us the prosecutor was attempting to establish guilt based only on his association with Cartwright.  Other evidence supported the conclusion that defendant was the second perpetrator of the robbery.  The victim immediately identified his photograph on the day of the crime, which was substantial evidence of the perpetrator's identity, even though the victim did not confirm the identification at trial. (*People v. Boyer* (2006) 38 Cal. 4th 412, 480 [a testifying witness's out-of-court identification may, by itself, be sufficient evidence of the defendant's guilt even if the witness does not confirm it in court; indeed, an out-of-court identification, generally has *greater* probative value than an in-court identification, even when the identifying witness does not confirm the out-of-court identification.])  Furthermore, defendant's facial and physical characteristics were similar to the perpetrator's, and defendant's physical characteristics were distinctive - he was six feet six inches tall and broad shouldered.  The victim described these characteristics and they were visible on the surveillance video.  These facts were highly probative of defendant's identity as the perpetrator.  His membership in the same gang as Cartwright was simply further relevant evidence on the issue of identity.  (*People v. Champion* (1995) 9 Cal.4th 879, 922 ["evidence that defendants were members of the same gang as other persons involved in the commission of the crimes in this case fortified the testimony of the persons who identified defendants as participants in the murders.  Thus, evidence of defendants' gang membership tended 'logically, naturally, and by reasonable inference to establish their identities as perpetrators of those offenses"], disapproved on another point in *People v. Combs* (2004) 34 Cal. 4th 821, 860; *see People v. Pasencia* (1985) 168 Cal. App. 3d 546, 553.)

We conclude the jury would have understood the relevance of defendant's association with Cartwright in light of the other evidence of the defendant's identity as one of the perpetrators and the prosecutor's argument as a whole.  It is not reasonably likely the prosecutor's remarks were understood by the jurors as arguing defendant's guilt by association. (*People v. Smithey, supra*, 20 Cal. 4th at p.960.)"

*See* Lodgment No. 6 at 10-12.

### 3.    Analysis of Petitioner's Habeas Claim

To constitute a denial of Petitioner's right to due process, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987), quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985).  The reviewing court must determine whether the prosecutor's misconduct served to "so infect the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U.S. 168 ,181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  [T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  Accordingly, the court considers the challenged statement not in isolation, but in the

context of the entire trial.  *See e.g. Donnelly*, 416 U.S. at 643 (considering fundamental

fairness in light of the entire proceedings).

 Established federal law holds that during closing argument, a prosecutor may argue

reasonable inferences based on the evidence.  *See United States v. Molina*, 934 F.2d

1440, 1445 (9ᵗʰ Cir.1991).  "Counsel are given latitude in the presentation of their closing

arguments, and courts must allow the prosecution to strike hard blows based on the

evidence presented and all reasonable inferences therefore."  *Ceja v. Stewart*, 97 F.3d

1246, 1253-54 (9ᵗʰ Cir. 1996) (*quoting United States v. Baker*, 10 F.3d 1374, 1415 (9ᵗʰ

Cir. 1993)).  The Ninth Circuit has made clear that "the use of gang membership evidence

to imply 'guilt by association' is impermissible and prejudicial.'  *Kennedy v. Lockyer*,

379 F.3d 1041, 1056 (9ᵗʰ Cir. 2004).  Specifically, the prosecution may <u>not</u> introduce

evidence of gang membership in order to prove intent or culpability. *Id.* at 1055-56.

However, evidence of gang affiliation does <u>not</u> violate the constitution if it is relevant to a

material issue such as identity.  *United States v. Easter*, 66 F.3d 1018, 1021 (9ᵗʰ Cir.

1995) (evidence tending to show identity such as gang-related connections between the

defendants did not unduly prejudice defendants) ; *United States v. Fagan*, 996 F.2d 1009,

1015 (9ᵗʰ Cir. 1993) (gang affiliation evidence admissible to bolster policeman's identifi-

cation of defendant).

 After a review of the trial transcript in full, and in light of the other identity

evidence introduced at trial, the appellate court's decision finding the prosecutor did not

attempt to establish Collins' guilt based solely on his association with Cartwright was not

contrary to federal law.  As the court of appeal found, the prosecutor's remarks about

Collins' gang connection to Cartwright were made, not in isolation, but in conjunction

with his discussion of other identity evidence introduced at trial including: (1) Collins'

distinctive broad-shouldered stature at six foot six inches (*see* Lodgment 2 at 79, Re-

porter's Transcript); (2) the identification of Collins' photograph by store employee

Labrena James on August 20, 2008 - the day of the crime *(see* Lodgment 2 at 121-122,

Reporter's Transcript); and (3) video surveillance, also from the day of the robbery,

which captured Collins committing the crime (*see* Lodgment 2 at 84-88, Reporter's Transcript).  During closing argument, a prosecutor is permitted under federal law to argue reasonable inferences based on the evidence.  *Molina*, 934 F.2d at 1445.  As listed above, the prosecutor discussed other key pieces of identity evidence at length during his closing argument.  It was both reasonable and permissible for the prosecutor to also reference Collins' close affiliation with Cartwright.  Their relationship was material, among several other pieces of evidence, to establishing Collins' identity as the second perpetrator of the crime.  *See Easter*, 66 F.3d at 1021 (reference to gang membership is proper as a matter of identification).

Finally, the jury was instructed by the trial court "to use only the evidence that was presented in th[e] courtroom.  Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider.  Nothing the attorneys say is evidence.  In their opening statement and closing arguments, the attorneys discussed the case, but their remarks are not evidence."  *See* Lodgment 2 at 229, Reporter's Transcript.  The jury is presumed to follow the court's instructions.  *Weeks v. Angelone*, 528 U.S. 225, 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000)(citation omitted).  In light of the entire proceedings where other identity evidence was introduced and the jury was instructed as to the significance of closing arguments, it was not unfair for the prosecutor to note Collins and Cartwright's connection to each other.  **IT IS THERE-FORE RECOMMENDED** the Court find the prosecutor's gang affiliation argument did not impact the jury's verdict so unfairly as to constitute a denial of Petitioner's due process rights.  *Darden*, 477 U.S. at 181.

///

///

///

## C.    Claim Two: ERRONEOUS ADMISSION OF EVIDENCE IN VIOLATION OF DUE PROCESS RIGHTS

Collins claims he was also denied his due process rights when the trial court permitted testimony of the prosecutor's gang expert concerning an extreme incident of witness retaliation in an unrelated case. Respondent contends the testimony regarding witness intimidation in gang-related cases was relevant and properly admitted, therefore the state court's denial of the claim was reasonable.

## 1. Gang Expert's Testimony

On direct examination of Officer Justin Lewis, the following testimony was admitted over the objection of Defendant's attorney:

Q. Based on your experience investigating gang-related crimes, is it common for victims of gang-related crimes to not want to come testify?

A. It's very common. It's – from my experience, it's nine times out of ten it occurs.

Q. Nine times out of ten what occurs?

A. The victim does not want to come forward.

Q. Have you talked to victims about the reasons why they don't want to come forward and testify?

A. Yes.

Q. What are some of the reasons?

A. They're in fear. I mean, they can be shot. They're scared. They're scared for not only their own lives but the lives of their family members.

Q. Have you ever seen a situation where a victim has been harmed because they have come forward to give details of the gang crime?

A. Yes, I have.

Q. Can you give examples of those?

MR. BUTKIEWICZ: Judge, I'm going to object on grounds of relevance. There's no evidence of that in this case.

THE COURT: Overruled.

16

THE WITNESS: In a matter that's already been – is done and over with and the suspects have been sentenced, the Brandy Nigh case, where she testified against some gang members, and some different gang members took her out in the mouth of the canyon and shot her in the head.  She survived that, and those suspects were – were convicted.

*See* Lodgment No. 2 at 173-174, Reporter's Transcript of Proceedings.

## 2.    The State Court's Decision

Collins raised his witness retaliation claim in the petition for review he filed in the California Supreme Court.  (Lodgment No. 9.)  The California Supreme Court denied the petition without citation of authority.  (Lodgment No. 10.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. *Ylst v. Nunnemaker*, 501 U.S. at 805-06.  The state appellate court rejected Collins' argument that testimony regarding witness retaliation in an unrelated case was improperly admitted:

"Defendant argues the trial court erred in admitting irrelevant evidence that in an unrelated gang case, gang members took a witness who had testified to a canyon and shot her in the head.  Defendant asserts that this real-life, graphic example of gang retaliation had no connection to this case or even to the Westside Crips gang in general.  He explains there was no evidence that the victim in this case was afraid or intimidated, and the shooting in the unrelated case was not relevant to any issue in this case.  We conclude the evidence was properly admitted.

"Evidence that a witness is afraid to testify or fearful of retaliation is relevant to the credibility of the witness and is admissible (citation omitted.)  For the evidence to be admissible, it is not necessary to show that the defendant personally made threats against the witness or that the witness's fear of retaliation is directly connected to the defendant.  The jury is entitled to be apprised of not only the witness's fear, but also of pertinent facts that would enable it to evaluate that fear, as long as the limitation of Evidence Code section 352 is observed....  Although the victim in this case did not explicitly state she was afraid to testify, she did explain that she did not want to be in court testifying and that she had been stressed by having to continue working in the store after the robbery - the implication being that she was afraid.  She also testified that during the robbery she was afraid of the taller man.  Her failure to identify defendant at trial raised the possibility that she was afraid to incriminate him at trial.  Accordingly, it was not improper for the prosecutor to elicit testimony establishing that in gang-related cases in general, it is extremely common for witnesses to be reluctant to testify out of fear, and that in a specific gang-related case, he had seen brutal retaliation against a witness.  (citation omitted.)  This evidence was relevant to the victim's credibility and allowed the jurors to consider whether her failure to identify the

1  defendant was a result of fear.  The trial court did not err in admitting the evidence."

2  Lodgment 6 at 12-13.

3      **3.     Analysis of Petitioner's Habeas Claim**

4      A state court's erroneous evidentiary ruling cannot form the basis for federal

5  habeas relief unless federal constitutional rights are affected.  *Whelchel v. Washington*,

6  232 F.3d 1197, 1211 (9th Cir. 2000) citing *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th

7  Cir.1987).  "While a petitioner for federal habeas relief may not challenge the application

8  of state evidentiary rules, he is entitled to relief if the evidentiary decision created an

9  absence of fundamental fairness that 'fatally infected the trial.'"  *Ortiz-Sandoval v.*

10  *Gomez*, 81 F.3d 891, 897 (9th Cir. 1996) (quoting *Kealohapauole v. Shimoda*, 800 F.2d

11  1463, 1465 (9th Cir.1986).)  However, if the evidence is logically probative of an element

12  the prosecution must prove, due process is not violated by its admission, *Estelle v.*

13  *McGuire,* 502 U.S. 62, 69-70 (1991)*,* unless it is "so unduly prejudicial that it renders the

14  trial fundamentally unfair."  *Dawson v. Delaware*, 503 U.S. 159, 179 (1992). "Only if

15  there are no permissible inferences the jury may draw from the evidence can its admis-

16  sion violate due process."  *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

17      The court of appeal summarized the relevant inferences flowing from the witness

18  retaliation evidence the trial court admitted.  The evidence of retaliation in cases involv-

19  ing gangs was circumstantial evidence admitted to prove that fear of retaliation and a

20  reluctance to testify was commonplace in cases involving gang members.  The evidence

21  was also relevant to whether Labrena James' failure to identify Collins in open court,

22  after she had identified him in a photographic lineup on the day of the robbery, resulted

23  from fear.   A review of the trial testimony demonstrates the witness retaliation evidence

24  and the inferences to be drawn from it is relevant and not unduly prejudicial in light of

25  testimony from Ms. James that: (1) she was "scared" at the point in the robbery when the

26  taller perpetrator (Collins) shoved her toward the back room; and (2) she found returning

27  to work after the incident "real stressful."  Lodgment No. 2 at 81-82.  Ms. James also

28

testified that she did not want to be in court to testify at all.  *Id.*  The exchange between

the prosecutor and Ms. James on direct examination was as follows:

Q.   Did one of the individuals approach you?

A.  Yes.

Q.  And what happened?

A.  He basically just told me it's a stickup, go to the back.

Q.  And was that the taller suspect or the shorter suspect?

A.  It was the taller.

Q.  How close was the taller suspect to you when that happened?

A.  He was right against me, like right behind me.

Q.  When he said it's a stickup, go to the back, did he touch you in any way?

A.  Yeah.  He just kind of made sure, like pushed my arm, make sure I just go to

the back.  Sort of forceful.  It wasn't like, real hard, but it was kind of like a shove on my

arm.

Q.  And what was the other individual doing while –

A.  I – I don't know.  I just know he walked to the back.  And then I don't know if

he stayed in the back or – I don't know exactly.  I didn't know at the time where he was.

Q.  At the point were you frightened?

A.  AT first, no.  I – I didn't really yake it seriously, but then once he told me – he

pushed me and told me to go to the back, yeah, I was scared, yeah.

Q.  What were you scared of?

A.  At that time I didn't know if they had any type of weapons on them.  And the

fact that I was a female, by myself with two men, and the man – the one tall guy was just

real big.

Q.  Miss James, you don't – you don't want to be here testifying today, do you?

A.  No.

Q.  Why?

1    A.  It's just real – it was real stressful just because after the incident happened I

2  still had to work in that same exact place.  And I've never been in this type of situation

3  before.  So it's – yeah.  I don't want to be here.

4    Q.  You don't want to be here testifying, do you?

5    A.  No.

6  Lodgment No. 2 at 81-82.

7    Given Ms. James' testimony regarding her fear at the time of the robbery and her

8  reluctance to appear at trial after the incident, the gang expert's testimony cannot be said

9  to be so unduly prejudicial that it rendered the trial fundamentally unfair. *Dawson*, 503

10  U.S. at 179.  **IT IS THEREFORE RECOMMENDED** the Court find the prosecution's

11  expert witness testimony regarding witness retaliation in gang-related cases did not

12  constitute a denial of Petitioner's due process rights.

13  **D.    Claim Three: SUFFICIENCY OF THE EVIDENCE**

14    Collins contends insufficient and "false" evidence supports his robbery conviction.

15  Specifically, Collins argues because the state appellate court found there was inadequate

16  evidence to support the jury's finding that he committed the robbery for the benefit of, or

17  at the behest of, a criminal street gang, his conviction for second-degree robbery and

18  active gang participation violates due process.  (Petition, ECF No.1 at 21-31.)

19    Respondent contends this claim is procedurally defaulted because when Collins

20  presented his sufficiency of the evidence claim to the California Supreme Court, it denied

21  the petition on adequate and independent state law grounds with citations to *In re*

22  *Waltreus*, 62 Cal. 2d 218, 225 (1965); *In re Dixon,* 41 Cal. 2d 756, 759 (1953) and *In re*

23  *Lindley*, 29 Cal. 2d 709, 723 (1947), thereby barring federal habeas corpus review.

24  Alternatively, Respondent argues there was sufficient evidence to support Collins'

25  identification as the second perpetrator of the robbery.  (Respondent's Memorandum of

26  Points & Authorities in support of Answer, ECF No. 20 at 26-27.)

27    When a state court's rejection of a federal claim involves a violation of a state

28  procedural rule which is adequate to support the judgment and independent of federal

12cv1301 DMS (WMc)

law, a habeas petitioner has procedurally defaulted his claim. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). A state procedural rule is adequate if it has been "firmly established and regularly followed" by the state court. *Ford v. Georgia*, 498 U.S. 411, 424 (1991). The procedural rule is independent if it is not "interwoven with the federal law." *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983).

The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent bears the burden of pleading and ultimately proving the existence of an adequate and independent procedural bar, with Petitioner bearing an interim burden of placing the adequacy of the defense at issue. *See Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003). The Court is not persuaded Respondent has carried its burden under *Bennett*. Although the state supreme court's citations to *Dixon*[3] and *Lindley*[4] suggest Collins' petition was denied on procedural grounds, the state supreme court's first citation to *Waltreus*[5] indicates a denial that "does not amount to a ruling on the merits or a denial on procedural grounds." *Pirtle v. Morgan*, 313 F.3d 1160, 1168 (9th Cir. 2002). Moreover, citation to *Waltreus* does not preclude federal habeas review. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991); *Forrest v. Vasquez*, 75 F.3d 562, 564 (9th Cir.1996). However, the Court does not need to decipher the state supreme court's citations as to whether there has been a procedural default because, regardless of whether the claim is procedurally barred, Petitioner is not entitled to relief. *See Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (noting that, in the interest of judicial economy, courts may resolve easier matters where complicated procedural default issues exist).

---

[3]"*Dixon* sets forth a procedural bar whereby a petitioner is precluded from raising on habeas issues that could have been, but were not, raised on direct appeal." *Jackson v. Roe*, 425 F.3d 654, 656 n. 2 (9th Cir.2005).

[4]The Ninth Circuit has held that a citation to *Lindley* stands for the proposition that an insufficiency of the evidence claim can only be considered on direct appeal and not on habeas review. *See Kim v. Villalobos*, 799 F.2d 1317, 1319 (9th Cir.1986).

[5]A state court's citation to *Waltreus* invokes the rule that a claim raised and rejected on appeal cannot be renewed in a state habeas petition. *La Crosse v. Kernan*, 244 F.3d 705, 705 n.11 (9th Cir.2001).

**1. The State Court's decision**

Collins' current sufficiency of the evidence claim is a variation on his previously raised sufficiency of the gang evidence claim, which was reviewed on direct appeal and in which the state appellate court reversed Collins' 10-year sentence for gang enhancement, *but upheld his conviction for robbery and active participation* as follows:

> "Defendant asserts that insufficient evidence supported the gang enhancement and the active participation conviction. We agree with the first of these two claims.....
>
> **A. Gang Enhancement**
>
> To establish a gang enhancement, the prosecution must prove two elements: (1) that the crime was 'committed for the benefit of, at the direction of, or in association with any criminal street gang,' and (2) that the defendant had ' the specific intent to promote, further, or assist in any criminal conduct by gang members....' [Citations omitted.] The crime must be 'gang related.' [Citation omitted.] ....A defendant's mere membership in the gang does not suffice to establish the gang enhancement..... [Citation omitted.] As we have explained, the first prong of the gang enhancement may be satisfied by any one of the three prongs– the crime was committed for the benefit of, at the direction of, or in association with any criminal street gang. We turn to the reasons why we conclude insufficient evidence supported each of these prongs in this case.
>
> First, the evidence was insufficient to support the finding that the robbery was committed *for the benefit of* the Westside Crips. The gang expert testified that the crime would instill fear in the community and the local gangs. But, although defendant and Cartwright were both gang members, there was no evidence that they made this known in any way, such that the crime would have benefitted their gang by enhancing its notoriety or respect....Also, there was no evidence the robbery was committed for the monetary benefit of the gang, rather than defendant and Cartwright personally....
>
> Second, there was no evidence that the robbery was committed *at the direction of* the Westside Crips gang. Although the expert opined that the gang members would not commit a robbery unless they were directed to do so, this opinion had no basis in evidentiary fact. Defense counsel pursued the issue and established that there was no evidence that anyone, including another gang member, had directed defendant and Cartwright to commit the robbery.
>
> Third, the evidence was insufficient to support the finding that the robbery was committed in association with the Westside Crips gang. The People argue that defendant's commission of the robbery with a fellow gang member proved this prong. However, we believe the Legislature intended that more be required. Otherwise, almost every crime committed by two or more gang members would qualify for a gang enhancement.... Here, the evidence established that two gang members walked into a clothing store within their territory and demanded money from the safe, and when that failed, from the cash registers. After getting the money, they walked out. As we have noted, there was no evidence that either defendant or Cartwright wore gang colors, made gang statements, or displayed gang signs, tattoos, or graffiti. The expert's opinion that robbery was one of the gang's primary activities was based on his experience and knowledge, but his

opinion that this robbery was gang related was not supported by the evidence....The enhancement finding must be reversed and the enhancement vacated."

### B.  Active Participation in a Gang –Street Terrorism

Under section 186.22(a), a person may convicted of a substantive gang participation offense, also called street terrorism....This crime consists of three elements: (1) the defendant actively participates in a criminal street gang (the active participation element); (2) the defendant knows at the time of such participation  and (3) the defendant willfully promotes, furthers, or assists *any felonious conduct by members of the gang* (the willfully assisted element).  The Supreme Court has recently confirmed that this third element does not require that the conduct be gang related; as the statute plainly states, the conduct need only be felonious criminal conduct.... Defendant challenges the last element, contending there was insufficient evidence the robbery was gang related and that he committed it promote, further, or assist the 'gang's criminal activities.'  But, as we have stated, unlike section 186.22(b) [gang enhancement], the plain language of this element states that felonious conduct – not gang-related felonious conduct or gang criminal activity – is all that is required.  Sufficient evidence supported the jury's conclusion that defendant willfully assisted the felonious conduct by Cartwright, a gang member."

Lodgment 6 at 13-19.

### 2.  Merits Analysis of Petitioner's Habeas Claim

The clearly established law regarding sufficiency of the evidence claims is set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In *Jackson*, the Supreme Court held that the Fourteenth Amendment's Due Process Clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson*, 443 U.S. at 324; *see also Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).

To analyze Collins' sufficiency of the evidence claim, the Court must engage in a thorough review of the state court record and view the evidence in the "light most favorable to the prosecution and all reasonable inferences that may be drawn from this evidence." *Juan H.*, 408 F.3d at 1275 (citing *Jackson*, 443 U.S. at 319).  "Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (quoting *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir.) *amended on denial of reh'g*, 798 F.2d 1250 (9th Cir. 1986).  A petitioner faces a "heavy burden" when seeking habeas relief by

1  challenging the sufficiency of evidence used to obtain a state conviction on federal due

2  process grounds.  *Juan H.*, 408 F.3d at 1275.

3                    **a.  Sufficient Evidence of Robbery**

4        Here, gang enhancement is a separate crime from robbery and one is not dependent

5  on the other.  Accordingly, the appellate court's determination that there was insufficient

6  evidence to support the jury's finding that the robbery was committed *for the benefit of or*

7  *at the direction of* a gang has no bearing on the jury's separate conclusion that Collins

8  committed the robbery.

9        In California, "[r]obbery is the taking of 'personal property in the possession of

10  another against the will and from the person or immediate presence of that person

11  accomplished by means of force or fear and with the specific intent permanently to

12  deprive such person of such property.'"  *People v. Lewis*, 43 Cal.4th 415, 464 (2008).

13  There was sufficient evidence of Collins' identity as the second perpetrator of the robbery

14  introduced at trial including: (1) Labrena James' testimony concerning the second

15  robber's giant stature at more than six feet tall (*see* Lodgment 2 at 79, Reporter's

16  Transcript); (2) identification of Collins' in a photographic lineup by Labrena James on

17  August 20, 2008 - the day of the crime *(see* Lodgment 2 at 121-122, Reporter's

18  Transcript); and (3) video surveillance from the day of the robbery, which was played for

19  the jury, that captured Collins and co-defendant Cartwright committing the crime. (*see*

20  Lodgment 2 at 84-88, Reporter's Transcript).

21        Collins argues improper gang evidence provided a crucial tipping point for the jury

22  to find he was the second robber, especially after Ms. James recanted her identification of

23  Collins at trial.  However, it appears to the Court that Collins has mistakenly grouped any

24  and all gang evidence together, thereby arguing incorrectly that *all* gang evidence

25  introduced at trial has been held by the appellate court to be insufficient.  That contention

26  is incorrect.  Gang affiliation evidence (i.e. evidence that Collins and Cartwright both

27  belonged to the same Westside Crips gang) was <u>not</u> found to be irrelevant or insufficient

28  by the appellate court which held: "[w]e conclude the jury would have understood the

relevance of defendant's association with Cartwright in light of the other evidence of the defendant's identity as one of the perpetrators..." [*See* Lodgment No. 6 at 12.] As cogently explained by the appellate court in its opinion, the only gang evidence found to be insufficient was expert testimony that the robbery was done *for the benefit of or at the direction of* the gang. *See* Lodgment 6 at 18 ("[the expert's] opinion that this robbery was gang related was not supported by the evidence....The enhancement finding must be reversed and the enhancement vacated.")

Moreover, when reviewing the sufficiency of the evidence, a court does not reweigh the evidence or redetermine issues of credibility resolved by the jury. *See Bruce v. Terhune*, 376 F.3d 950, 958 (9th Cir.2004); *Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000). Rather, the reviewing court must presume the "trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson,* 443 U.S. at 319. Applying that standard, **IT IS HEREBY RECOMMENDED** the Court find there was sufficient evidence of Collins' identity (including distinctive physical characteristics, video surveillance and identification in a photographic lineup on the day of the robbery) for the jury to conclude Collins committed the robbery beyond a reasonable doubt despite Ms. James' inability to identify him at the time of trial.

### b. Sufficient Evidence of Gang Participation

Similar to the Court's discussion of the sufficiency of the evidence to support Collins' robbery conviction, the gang participation offense under California Penal Code section 186.22(a) does not have the same elements as the gang enhancement offense under California Penal Code section 186.22(b)(1). Accordingly, the appellate court's determination that there was insufficient evidence to support a finding that the robbery was committed *for the benefit of or at the direction of* a gang has no effect on the sufficiency of evidence in support of Collins' gang participation conviction. The only proof necessary for a conviction under California Penal Code section 186.22(a) is Collins' participation in felonious criminal conduct with fellow gang member Ernest Cartwright.

Penal Code section 186.22, subdivision (a) applies to: "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang."  There was sufficient evidence of Collins' and Cartwright's gang membership in the Westside Crips as well as Collins' participation in the robbery with co-defendant Ernest Cartwright.  No further evidence was needed to satisfy the elements of the gang participation enhancement.  Specifically, evidence introduced at trial demonstrated Ernest Cartwright had been booked into the Kern County Jail more than 16 times between March 16, 2000 through February 15, 2008 and each time he claimed membership in the Westside Crips. [Lodgment No. 2 at 159-160.]  As for Collins, from 1995 to August of 2009, evidence introduced at trial indicated Collins had been booked 18 times and for 12 of those bookings, he claimed membership in the Westside Crips and requested prison housing away from Bloods, a rival gang.  [Lodgment No. 2 at 170-171.]  As the Court discussed in its analysis of the evidence in support of Collins' robbery conviction, *supra*, Collins distinctive physical characteristics, video surveillance and Labrena James identification of him in a photographic lineup provided sufficient evidence of Collins' identity to prove his participation in the robbery with Cartwright. (*See* Lodgment 2 at 79, 84-88 and 121-122, Reporter's Transcript).  "'[V]iewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime [of gang participation under California Penal Code section 186.22(a)] beyond a reasonable doubt.'"  *Juan H.*, 408 F.3d at 1275.  **IT IS THEREFORE RECOMMENDED** the Court find sufficient evidence of Collins' gang participation to sustain a conviction.

///

///

///

12cv1301 DMS (WMc)

# VI.

## <u>CONCLUSION AND RECOMMENDATION</u>

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition.

**IT IS ORDERED** that no later than **<u>October 4, 2013</u>**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **<u>October 25, 2013.</u>**  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.  *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED: September 12, 2013

_____
Hon. William McCurine, Jr.
U.S. Magistrate Judge, U.S. District Court